Thank you, Your Honor. May it please the Court, my name is Terrence Kellogg. I represent Michael Johnson. In preparation for argument, oh, I would like to reserve three minutes of my time. In preparation for argument, I had two thoughts that kept me awake, Bordenkercher and Leon. And with Bordenkercher, I was glad that I had that thought because it enabled me to find what I should have found much earlier, which was Judge Gould's opinion in the Kent case of last year, which is dispositive as to the issue of whether or not there's vindictive prosecution in the plea bargaining of an 851 sentencing enhancement based upon a prior conviction. All I can say at this point is I would ask the Court to revisit that opinion, as recent as it is, with all respect to its author, Judge Gould. That's okay. I don't have to assume any opinion I write about. How are you doing? I don't, my panel now, I think probably can't change that. You'd have to raise that for en banc. Well, I was kind of surprised that that opinion had not been, en banc had not been sought in that opinion. I don't believe that it had. Maybe I'm wrong in that respect. But I was glad to see that there was a decision in place because if nothing else, it resolves that issue and allows me this morning to focus on the search, which is our big issue, I think, that is involved with Mr. Johnson's case. And the search is such that it becomes a little convoluted because there's layers of issue with the search. It starts off with the separate residence argument. Could you help me? Yes, I hope. Because I find these search cases quite confusing when there are two multiple dwellings in a building. And so I wonder if you could just give us your, quickly, your version of the facts, the key facts that we need to understand. Well, I think that the key facts here are that at the time of entry at 135 South End by the SWAT team that was charged with gaining entry, it was immediately apparent to them following entry that there were two separate and distinct residences in that single-family residence, or what had been thought to be a single-family residence up to that point in time. Where were the officers who conducted the search at that time? Outside. There was a two-hour delay between the time of the initial entry, securing the premises, and the commencement of the search itself. There's a caveat to what I just said in that Detective Richardson, the day prior to the execution of the search warrant, had telephonic contact with the brother of Mr. Johnson, Chris Jeter, who was the resident in the downstairs unit. And that comes into play with the defense theory of the case being that Mr. Jeter had, for reasons of his own, set up Mr. Johnson. And it was because of that that Jeter had contacted Detective Richardson, making claims that Mr. Johnson had a warrant outstanding for his arrest and had possession of a firearm and was dealing with drugs. Be that as it may, I think that all of these search issues are related, which makes it even more confusing. They bashed their way in. Your Honor? The SWAT team, the officers are outside. Is it clear that the SWAT team told the officers that there were two residences? I think that there is in the record reference to that. They didn't bash their way in. The door was unlocked, and, in fact, when they touched it, it opened. As soon as they gained entrance, it was the door going to the left of the downstairs unit that they had to bash their way in. I submit that there was testimony that the officers conducting the search were told that. Whether there was or not, they realized that as soon as they went inside because the upstairs was clearly separate. There was an individual in the downstairs unit that they wanted to, they being the officers, wanted to come out of the unit who had to crawl through a window because he couldn't access the blocked door that was to the left on the lower unit. As soon as the searching officers went upstairs, they saw a separate kitchen area, separate bedroom area, separate bathroom. So between that and the locked area, even if they had not been told, it was abundantly clear. How many of the premises did they search? One? How many of the what? Of the dwelling units. They searched one? Well, they searched the entire house. And that is part of the defense concern with the issuance of the warrant in this instance because they did not ask for a warrant for the search of 135 South End. They asked for a warrant of the entire premises, which would include the recycling center, the hens where the main man, leader of the overall conspiracy organization, Arturo Barajas Garcia, rented to keep chickens, hens, and that a lot of the wiretaps were talking about going to the hen place, at the hens, he's with the chickens, which we submit is not probable cause for the search of 135 South End. But the search was incredibly extensive. It was every bit as broad as the warrant which issued,  But didn't the officers have evidence that the entire premises were used for possession and distribution in this group of conspirators? Well, Your Honor, I say that that's why Leon does not apply in this instance. And the reason is is because the evidence which the officers had set forth in the affidavit for issuance of the search warrant as facts establishing probable cause were really conclusions which didn't follow from the observed facts. The most important part of that was the representation in the search warrant affidavit that Candido Hernandez had free access to 135 South End. The basis for that was observations that Hernandez on two occasions approximately six weeks before the application for the search warrant was seen twice going in and coming out of 135 South End. So from that, the representation by the affiant is that Mr. Hernandez has free reign. The problem becomes increased with the representations in the affidavit for the search warrant as to the primary resident, as he's characterized, Mr. Jeter. And there's four instances of probable cause of Jeter's involvement in drug activity. One of those involves Hernandez. But of those four incidents which are related, justifying the search of 135 South End, there's only one of them that took place at 135. The others were all apart from that residence, seeing Mr. Jeter in his orange car going to a gas station, discussion of a delivery, Jeter appearing at a restaurant where drugs are discussed with Hernandez and others. Nothing to do with Michael Johnson. So we submit that every one of the four exceptions as to when Leon would not excuse what would otherwise call for a suppression of a search warrant are evident here because there was misleading in the affidavit of the search warrant, characterizing conclusions as facts and setting forth more than the probable cause that was there. The issuing magistrate basically advocated their role. If you look at Cruz and what's required, going back to Gates, what they talk about the role of the magistrate judge being in issuing these and how we should not abdicate that responsibility on appeal, on review. And that was done here because those issues weren't asked. Those questions weren't addressed. This is a clear case. We see it often where you have a 30- or 40-page affidavit that references, by way of attachment, another 130-page affidavit. But there's essentially a paucity of probable cause as to the search of a specific residence. Even had it been there, there was no indication that would justify a search of the upstairs portion when it became abundantly clear to those searching that it was, in fact, a separate area. Let me go back to a question Judge Schroeder asked you. In the motion to suppress, what was it you sought to suppress? Anything found in the junior portion of the house? Anything found in the upstairs portion of the residence that they referred to as Mr. Johnson's. Only the Johnson area, whatever was seized there. Yes, and that would include the AR-15 weapon found on the roof and the drugs that were found on the roof. Because they were in a position, maybe not the drugs that were found on the roof, but certainly the firearm, because Detective Richardson, who observed that looking out a window when she was flipping the mattress, it was derivative fruit because of that. They had two hours from the time that there was initial entry for securing the residence before they commenced the search. They could easily have sought telephonic application for the upstairs search to clarify it. Instead, now the government wants to rely on an overly broad, generalized warrant for which there was no probable cause. That is our concern, and that's why I say that not only are there separate residence concerns, the government's answer to that appears to be, but the warrant here was for the entire premises, unlike Maryland v. Garrison where the search warrant was for a person instead of an area. Well, I submit that that's the same way of saying that the search warrant here was not supported by probable cause and was overly broad. Well, let's just assume it's supported by probable cause for a moment. Could we just do that? Absolutely, Your Honor. Your argument is it's overly broad because it covers the entire structure? Certainly at the time that they realized that there are two separate residences. Right. So your argument is that although assuming they had probable cause to search to believe that there was drug activity going on in this building and they had probable cause to enter, that as soon as they realized that there were two residences, they needed probable cause. They needed to get a warrant for each one. Is that what they should have done? What is the proper? Well, we only had standing as to the upstairs, and we're saying that they should have clarified that the warrant that they had authorized the search of the upstairs, because all of the probable cause that they had was tied to Mr. Jeter, who was downstairs. So the problem that I have with Your Honor is that it was in the affidavit. It was in the affidavit. No. Did they know who was Jeter and who was Johnson and who was in which part of the house at the time? They knew nothing about Mr. Johnson until they saw him at the top of the stairs with his pit bull. They had observed Jeter, and that's what's set forth in the affidavit. Part of the problem that I have with Your Honor's questions is that when you talk about entrance to the building and entrance to the house, there are two separate and distinct areas. And I'm just trying to figure out what, in your view, they should have done. At what point they should, assuming that there was probable cause to believe that there was drug activity in the building, what was the proper thing to do? They should have determined whether or not the probable cause in the warrant would justify the search upstairs by applying telephonically for a clarification or a second warrant for the upstairs separate unit. The affidavit was limited in its probable cause to the house, but for the Candido-Hernandez access to the entire premises, which was set forth as a fact, but was a conclusion with an inadequate factual basis. And that was in the affidavit. If Leon says that officers are to be held by the probable cause that's set forth in the affidavit as one of the exceptions when it's so lacking it cannot be relied upon, that is the sort of exercise that I think is expected. And certainly that's what should have been done here. The searching officers should have realized that. I believe I, unless there's more questions, wanted to reserve my remaining time. Thank you, Mr. Keller. You've only got a minute left, but we'll give you another extra minute. We have two minutes. Ms. Bruner, thank you, and we'll hear from you. Thank you, Your Honor. May it please the Court, my name is Helen Bruner. I'm here to represent the United States in this matter. Let me turn directly to the search issue, and I think really I would like to just break it down into its component parts. The first question is whether there was probable cause to issue the warrant in the first place, and the second being if there was, of course, whether the search itself was overbroad. So turning first to the question of whether or not there was probable cause, I would assert that there certainly was, and I think there's more than just conclusory statements here. The affidavit was actually a combination of two affidavits, the larger affidavit being setting forth all the information that was known about the and the more particular affidavit related to 135 South Ann, which incorporated the larger affidavit by reference. The larger affidavit set out what was known about the organization based on wiretaps, surveillance, conversations, and undercover purchases of methamphetamine. Now, with respect to South Ann, what it sets forth in the affidavit is, yes, that it's the primary residence of Christopher Jeter, and that he is, in fact, the name on the utilities account. But it sets forth very much more. It sets out that surveillance showed that Mr. Hernandez may be staying at the residence. That certainly was a conclusion, but it was a conclusion based on fact. The agents through surveillance saw him coming and going from the residence, at least on the 12th of October, which was some nine days prior to the search warrant, at least twice on that date. It also set forth information that came from the wiretap to include the fact that on one occasion, in this case the 8th of August, that Mr. Hernandez was going to meet Barajas Garcia at the residence. And that when a phone call comes later that day, Hernandez says to Barajas Garcia, come into the house when you get there. There are other calls, one on October 2nd, where Mr. Villanueva Vegas meets Mr. Barajas Garcia there. He's another member of the conspiracy, again meeting Mr. Barajas Garcia. There's another individual named Carranza Lua who also meets Mr. Barajas Garcia there. So what we know is aside from the questions of Mr. Jeter's dealings with methamphetamine, this location is a location where these conspirators go. They go to meet, they go to meet to exchange drugs and money. And that's the basis for the probable cause. So I think under those circumstances, it was certainly reasonable for the court to issue a warrant for the entire premises, the residence and the outbuildings, because they talk about the hens and the roosters. Now that gets us to the execution of the warrant. The warrant is for 135 South End. And I think it's well established based on the testimony at the suppression hearing and some of that, again, was repeated during the course of the trial itself, that when the agents went through the front door, that front door was unlocked. And the one thing that is abundantly clear is from the front door they could go directly upstairs. There was no further locked door that would delineate the front door from Mr. Johnson's residence. What is also clear is that front door goes into a, what I guess I would call a foyer area, which had a door that went to the first floor and that that first, that door was closed and that it had what has been variously described as an L-bracket. And the testimony was that there were screws into the door jam and screws into the door holding it shut. It was clear that it was locked off and that it had butcher paper over it. Is that what the SWAT team? That's what the SWAT team then bashed in. So I would assert, based on that, that when officers have a warrant for 135 South End, they would go directly upstairs. Is that what they did? Yes, exactly. They went directly upstairs and they found the stuff? What they find upstairs, what happens first is, of course, Mr. Johnson has a pit bull, and he is holding back the pit bull. Then they deal with the pit bull, put it in the bathroom, ultimately get animal control, clear the rest of the house. It's clear from the testimony that in the meantime some of the officers breach, as they put it, breach, open that door from the foyer into the residence. They also go then to the back of the house, to the kitchen door. That door was locked. They opened that door. And when they clear the house, eventually the actual searching agents go in, and they're the ones who find in the residence the Tec-9, the Intratec-9. Inside the upstairs, the grenade, the cut, not the methamphetamine, but the other drugs. They searched both of them? Pardon me? They searched both of them? They did search both. Well, would you agree that if they had a warrant for the building, they go in and they search one, the first, they search the area occupied by the person they have probable cause to think may be dealing in drugs, and they find nothing, and so then they search another, the other residence there, that they probably ought to have a warrant for that second residence before they search it? Your Honor, given your hypothetical, I would agree. If, in fact, everything had been tied to Mr. Jeter, I might have a different answer here, and I would also point out if, in fact, it was abundantly clear that this was, in fact, two separate residences. There's no dispute that that door was locked or blocked. I should say blocked because I think there was some dispute as to whether there was a padlock on it or not, but there's no question you couldn't go through it. The mere fact that there's two kitchens in the residence doesn't really necessarily mean that it's really two separate residences, and I think the record is also clear that there's nothing that would have indicated this was, you know, something that said Jeter upstairs or Jeter downstairs. Let me make sure that I'm not misstating this and Johnson upstairs or Residence A and Residence B. If we were walking through the front door and you saw two separate locked doors, that would be different. But I would also suggest, Your Honor, that while Mr. Jeter's activities related to methamphetamine and his connection to the Barajas-Garcia drug organization was important to the probable cause, it was not the only thing that connected this to methamphetamine dealing. So I think under those circumstances, I think that's why the warrant was for the entire residence. I mean, I know that there was also some testimony during the suppression hearing as to what the officers knew. I think it's quite clear that Corey Williams did not recall any information about what Detective Richardson had said she had learned from Mr. Jeter. But having said that, if in fact that had been added to the affidavit, that Mr. Jeter said Johnson lived upstairs and was dealing in methamphetamine, I think that would give stronger support for a search of Johnson's residence than the entire building. So I'm not sure how that would help Mr. Johnson's cause. Apparently, there was no means of egress from the lower portion of the house because of the lock. Is that correct? No. There's, from, in other words, if you were on the second floor, your only means of getting out is through the front door. If you were on the first floor, you could get out through the kitchen door or a sliding door that was from one of the back bedrooms. Not through the front door. But not through the front door. So you couldn't get in. The testimony, there was testimony at trial about when that may have been installed. Mr. Candida Hernandez pegged that time period to being about a week before the search warrant when the two brothers had had a serious falling out. But up until that point in time, the door had been open. I've looked at an exhibit which shows what you referred to as a foyer, and it looks like there's stacks of stuff next to this fairway. That's correct, Your Honor. It looked like a storage area. The agents, I think, described it as a pile of junk, but I think there's a pile of material that is piled up rather high up against the staircase. But I do think from the testimony and what I've seen of the exhibits that they certainly could see that there was butcher paper over what was indeed the door and then were able to open that door. So I don't think that I could say to the court that the junk or the material that was piled up obscured the door. I had one question for you. Yes, Your Honor. There's an opinion, I think Judge Trott may have written it, called Mena, M-E-N-A. Yes, Your Honor. It has some language relating to maybe stopping a search when you find out there's a different, more than one residence. So, I mean, how do you analyze that case, and does it have any effect here? Your Honor, I think if I can, I think the facts in that case were, if I recall correctly, it was more in the nature of a rooming house with padlocks on a number of the doors or locks on a number of the bedroom doors. And there was some question in that case whether the officers, what the officers knew in advance, and these officers who had sworn out the affidavit in support of the warrant for the Mena residence had actually been there previously. But I think what I would observe about Mena is, in that case, they were looking for evidence related to a particular individual and his role in a crime. There's language in Mena, and I'm afraid I can't quote it entirely, but it also makes reference to the fact that if the officers instead had probable cause to believe that the entire residence, in fact, might be a location where evidence would be found, that even the fact of the locked doors might not make a difference. So I think what we have here is a residence where the officers clearly had probable cause to believe the entire residence had some connection to the crime. People associated with this conspiracy were coming and going with regularity. And even though there was now a division between the two floors, did not suggest to them that they had, in fact, two separate residences where you might have an innocent individual whose property rights were now being searched. And I think in Mena as well, one of the things that was of concern was the fact that you might understand that you had the wrong location when you broke down the first of the doors, I think is how it's described. And in this instance, I don't think the searching officers had any reason to believe that they were in the wrong place. Thank you. If the Court has no further questions for me, I will ask the Court to affirm. Thank you. Okay, Mr. Kellogg. And Stacy, add another minute for Mr. Kellogg. A couple of things. There were two different Washington State Patrol SWAT teams that were securing the 135 South End house simultaneously. One was going through the front door. One was going through the downstairs rear kitchen area, which was the only access. The sliding glass door was also to the rear. They were doing this at the same time. Once they took control of the area, they then removed the individuals that were found inside. There was a person, as I referred to before, that was removed out of the downstairs front window because the door wouldn't open. There was somebody seen running from the area, and there was Mr. Johnson and Kathy Klepper from the upstairs. So I think that that's something that's important. One thing that gets confusing here quite quickly when analyzing the probable cause and what was going on is the government wanting to jumble together the indicia of probable cause at the hen area, which was, again, rendered by Borajas Garcia, visited by Hernando Hernandez, Candido Hernandez, as well as various other individuals who were working for that organization, Saldana Robles, Mr. Vegas, those individuals that were found on the wiretaps to be conducting business at the hens or with the chickens. Not probable cause for a search of the house. The MENA decision, it seemed to me like some of the facts were more coming from Marilyn V. Garrison than from MENA. MENA itself, as I recall, the affidavit referred to a confidential informant who specifically stated that none of the other bedroom areas in the house to be searched had locks on them. So when the officers appeared, they found locks. I don't see how the government can justify arguing that in this instance it was not clear to the arresting officers, especially given the length of time that they had before they started the search, actually, that there were not separate areas, when there is clearly a separate locked entrance to the downstairs area, they should have looked at the probable cause. Thank you. Unless there's more questions, I will also submit the matter. Thank you very much. Thank you, Mr. Keller. Okay, Stacy, please show that case as being submitted, and we will adjourn for the day. All the cases argued today are submitted. All rise.
judges: Schroeder, Alarcon, Gould